Filed 2/28/19; Modified and Certified for Partial Pub. 3/21/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DAVID BEVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TERRACE VIEW PARTNERS, LP, et al., <br><br> Defendants and Appellants. | D071849 <br><br><br> (Super. Ct. No. 37-2013-00057526-CU-PO-EC) |
| DAVID BEVIS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> TERRACE VIEW PARTNERS, LP, et al., <br><br> Defendants and Appellants. | D072825 <br><br><br> (Super. Ct. No. 37-2013-00057526-CU-PO-EC) |

Consolidated APPEALS from a judgment of the Superior Court of San Diego

County, Eddie C. Sturgeon, Judge.  Affirmed in part; reversed in part.

Cooksey, Toolen, Gage, Duffy, & Woog, Phil Woog, Matthew R. Pahl;

DENTONS, Charles A. Bird; Manning, Kass, Ellrod, Ramirez, and James E. Gibbons for

Defendants and Appellants in D071849 and D072825.

Allen, Semelsberger & Kaelin, James C. Allen, and Jessica S. Taylor for Plaintiffs

and Appellants in D071849 and for Plaintiffs and Respondents in D072825.

INTRODUCTION

Sixty-nine current and former residents of mobilehome park Terrace View Mobile

Home Estates (Terrace View or the park) filed the present lawsuit against the park's

owners, Terrace View Partners, LP, Thomas T. Tatum, Jeffrey A. Kaplan, and

management company, Mobile Community Management Company (collectively,

defendants). The operative first amended complaint, styled as a class action, included

12 causes of action based on allegations that defendants' failure to maintain the park in

"good working order and condition" created a nuisance that, along with unreasonably

high space rent increases, made it difficult or impossible for park residents to sell their

mobilehomes. After the court denied the plaintiffs' motion for class certification, the

parties and the court agreed to try the case in phases, with the first phase involving

16 residents living in 10 spaces in Terrace View.[1]

---

[1] The 16 residents who were selected to try the first phase of the case are David Bevis, Gerri Bevis, Francis Bevis, Juanita Colley, Keith Dereld, Janice Dereld, Christie Johnson-Fowler, Rebecca Fullerton-Jones, Sabino Galvan, Ubelia Galvan, Philip Mast, Victoria Rose Mast, Terry McMeans, Jennifer Moore, Larry Summers, and Joyce Summers. We will hereafter refer to these 16 residents collectively as "plaintiffs" and refer to the entire group of 69 plaintiffs as the "homeowners."

2

A jury in the first phase returned a special verdict finding defendants liable and awarding the individual plaintiffs economic and noneconomic damages under the following causes of action or theories, as they were identified on the verdict form: intentional interference with property rights, breach of the covenant of good faith and fair dealing, nuisance (based on substantially failing to enforce the park's rules and regulations), breach of contract/breach of the covenant of quiet enjoyment, and negligence/negligence per se. The jury found defendants were not liable for nuisance based on failing to provide and maintain the park's common facilities and physical improvements in good working order and condition, and were not liable for elder financial abuse against five of the plaintiffs.

The jury awarded the individual plaintiffs economic, noneconomic, and punitive damages in varying amounts. The total amounts awarded were $1,289,000 in compensatory damages ($759,000 in economic damages and $530,000 in noneconomic damages) and $57 million in punitive damages. After the jury was discharged, the court issued an order on plaintiffs' cause of action alleging defendants violated Business and Professions Code section 17200 et seq., commonly referred to as the unfair competition law (UCL). The court ruled that a "catch-up" provision in defendants' long-term leases that can greatly increase rent at the end of a lease term was unfair in violation of the UCL.

The court entered judgment reflecting the jury's awards, and the court's ruling on plaintiffs' UCL claim and grant of injunctive relief on that claim.[2] The judgment also reflects the court's rulings at the beginning of trial that certain other provisions in the parties' lease agreements violated California's Mobilehome Residency Law[3] or were otherwise unlawful. After the court entered the judgment, it issued an order reducing the punitive damages awarded to plaintiffs to match their awards of compensatory damages, making the total amount of punitive damages awarded against defendants $1,289,000. The court also awarded attorney fees to plaintiffs in the amount of $2,385,773.70 plus costs of $56,417.72.

Defendants appeal from the judgment and postjudgment order awarding plaintiffs' attorney fees and plaintiffs appeal from the postjudgment order reducing the jury's award of punitive damages. Defendants contend: (1) the amount of rent they charged plaintiffs under their lease and month-to-month rental agreements cannot be restricted in the absence of a rent control ordinance; (2) there was insufficient evidence to support the verdict on plaintiffs' cause of action for intentional interference with property rights; (3) the court prejudicially erred by giving an erroneous special instruction on the implied

[2] The judgment is entitled "Amended Judgment," although it is the only judgment entered in the case.

[3] California's Mobilehome Residency Law (Civ. Code, § 798 et seq.) (MRL) "regulates relations between the owners and the residents of mobilehome parks." (*Cacho v. Boudreau* (2007) 40 Cal.4th 341, 345.) The MRL "governs mobilehome tenancies in mobilehome parks" and "regulates the contents of rental agreements and the termination of tenancies." (*Griffith v. County of Santa Cruz* (2000) 79 Cal.App.4th 1318, 1321.) The provisions of the MRL are required to be provided to mobilehome tenants and incorporated into their rental agreements by reference. (Civ. Code, § 798.15, subd. (c).)

4

covenant of good faith and fair dealing; (4) there was insufficient evidence to support the verdict on plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing under the correct legal standards; (5) the court abused its discretion in denying defendants' request to bifurcate the trial of plaintiffs' equitable cause of action for violation of the UCL; (6) the court prejudicially erred by changing its ruling on the legality of the catch-up provision in defendants' lease after trial; (7) the court erred in ruling the catch-up provision was unfair under the UCL; (8) the court's ruling that defendants violated the UCL cannot be upheld under the fraud prong of the UCL; (9) the court erred in denying Terrace View's motion for new trial on the ground of irregularity of the proceedings based on plaintiffs' counsel's improper opening and closing argument; (10) the jury's award of economic damages of $750,000 for diminution of property value, overpayment of rent, and/or interference with use and enjoyment of homes was not sufficiently supported by the evidence; (11) the award of punitive damages was not sufficiently supported by evidence of malice, oppression, or fraud; and (12) the court abused its discretion by awarding plaintiffs' full recovery of attorney fees despite their failure to prevail on some of their claims and the unavailability of attorney fees for their UCL cause of action, and by not reducing plaintiffs' fee award by the amount they billed for unadjudicated medical treatment claims and their unsuccessful class certification motion; and (13) the court erred in awarding an enhancement to the lodestar amount of plaintiffs' attorney fees.

In their appeal from the postjudgment order reducing the jury's award of punitive damages, plaintiffs contend the court erred in reducing the jury's award of punitive damages to the amount of compensatory damages.

We conclude the jury's award of compensatory damages and punitive damages must be reversed. Although the jury's award of economic damages may have included unspecified amounts that could be upheld on appeal if the special verdict form had segregated them, it is clear from the record that the vast majority of the economic damages awarded represented reimbursement for overpayment of rent and diminution in value of homes caused by high rent. Because the award of such damages cannot be sustained under any of the theories of liability presented to the jury and it is impossible to sever any properly awarded damages from improperly awarded damages, we reverse the entire award of compensatory damages and the attendant awards of punitive damages and attorney fees and costs to plaintiffs.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are current or former residents of Terrace View who purchased their mobilehomes from third parties and rented mobilehome spaces in Terrace View from defendants. Terrace View is located in an unincorporated area of San Diego County near Lakeside and El Cajon. There are numerous mobilehome parks in that area. Terrace View is not subject to a rent control ordinance. New residents of Terrace View were

6

given a choice between a long-term lease or a month-to-month rental agreement.[4]  The terms of the long-term leases ranged from three years to ten years, based on the type of lease that was being offered when the tenant moved into the park.

The long-term leases contain two rent increase provisions that are at issue in this case.  The first rent increase provision at issue is paragraph 4.2, which provides for annual rent increases as follows:  "Resident's rent will increase on each anniversary of the Rent Commencement Date as referred to in the Abstract, (referred to in this Agreement as the "Annual Rent Increase Date") by the Consumer Price Index formulas, as referred to in the Abstract and as explained below, plus any amounts of Cost or Expense as set forth in paragraph 4.3 of this Agreement.  All such rent increases will take effect on each Annual Rent Increase Date, unless provided otherwise in this Agreement.  Resident agrees that Resident is responsible for payment of the increase amount effective the first day of the month for each Anniversary Increase Date.  [¶]  Resident's rent increase will be calculated as follows:  The annual percentage change in each of the Consumer Price Indexes (CPIs) referred to in the Abstract will be calculated and then four percent (4%)

---

4      The 36-month lease agreement states:  "RESIDENT ACKNOWLEDGES THAT OWNER HAS OFFERED RESIDENT THE OPTION OF:  A MONTH-TO-MONTH RENTAL AGREEMENT, A RENTAL AGREEMENT HAVING A TERM OF TWELVE (12) MONTHS, OR A RENTAL AGREEMENT HAVING A TERM WHICH IS LONGER THAN A MONTH-TO-MONTH TENANCY BUT LESS THAN TWELVE (12) MONTHS IN LENGTH.  RESIDENT ACKNOWLEDGES THAT RESIDENT COULD HAVE ELECTED TO ACCEPT ANY ONE OF THOSE THREE (3) OPTIONS AND THAT, SOLELY AT RESIDENT'S ELECTION, RESIDENT HAS OPTED FOR THIS THIRTY-SIX (36) MONTH LEASE."

will be added to each of those percentage changes."  Annual rent increases for month-to-month tenants were one percent higher than increases for tenants under long-term leases.

The other rent increase provision at issue is paragraph 4.4, referred to in this litigation as the "catch-up" provision.  Paragraph 4.4 provides for rent increases near the end of a lease term as follows:  "Additional Increase in 30th Month Of Agreement. Effective on the first day of the thirtieth (30th) month of this Agreement, Resident's monthly rent will increase, upon giving notice as then required by law, to an amount equal to the arithmetic average of the three highest rents then being charged for any spaces in the Park, but shall, in no event, result in a decrease in rent for the resident."[5]

Paragraph 11.3 of the written leases address a resident's sale of a mobilehome and provides that if the buyer intends to leave the home in the park, the seller must assign and the buyer must assume the written lease agreement, subject to the park's approval. However, the park reserved the right to terminate the lease or refuse to allow an assignment of the lease "in accordance with law and the provisions of [the lease]."[6]

---

[5]    The quoted provision is from a three-year lease agreement.  The number of the month is larger in an agreement with a longer lease term.  It is unclear why the rent increase is made effective six months before the end of the lease term.

[6]    Paragraph 11.3 of the written leases provides:  "If the transferee intends to leave the Mobilehome on the Space, Resident must assign and the transferee must assume this Agreement, and the provisions of Paragraph 12 [requiring the park's approval of a transfer] and this Paragraph 11.3 shall apply.  Notwithstanding the foregoing sentence, Owner reserves the right to terminate this Agreement upon the transfer of Resident's Mobilehome.  In addition, Owner may, at Owner's sole option, refuse to allow an assignment of this Agreement upon the transfer of the Mobilehome in accordance with law and the provisions of this Agreement."

8

The written lease agreements begin with a four-page document entitled "Lease/Rental Agreement Abstract Information." The Abstract sets forth the amount of the tenant's beginning rent and certain key provisions of the lease, including the annual increase provision (paragraph 4.2) and the catch-up provision (paragraph 4.4).

Because the annual rent increase provision and catch-up provision in the lease could result in substantial rent increases, the park offered tenants whose rent was about to increase rent reductions through a program it called the Emergency Rent Stabilization Program (emergency rent stabilization). The tenant received a substantially lower rent increase than the lease otherwise allowed by signing an "Amendment to Lease/Rental Agreement With Rent Adjustment" that included or required the tenant to sign a separate release of claims, arbitration agreement, and right of first refusal agreement that gave Terrace View the first right to purchase the tenant's mobilehome if the tenant offered it for sale. The emergency rent stabilization increase was 1 percent for a long-term lease and 2 percent for a month-to-month tenancy.

At trial plaintiffs' expert witness Robert Caringella, a commercial appraiser, testified that the average monthly space rent in Terrace View in 2013 was $1,204, and the average of the three highest rents in the park was $1,604.64. The average rent plaintiffs were paying was "over $1,500 a month. Some of them are as much as $1,800 a month." The average space rent at four or five other mobilehome parks in the area was $850. Caringella testified that market monthly rent for Terrace View was $900 to $1,000, and that his rent figure assumed Terrace View was "well·managed, there's no problems with

9

maintenance, there's no issues with water, sewer, electrical, that this is a nice place to live."

The individual plaintiffs testified at trial about conditions at the park and the effects of rent increases under their rental agreements. Keith Dereld testified that he and his wife Janice Dereld bought their mobilehome in 2000 for around $47,000. They tried to sell the home in 2004 but were unsuccessful. Keith became unhappy with conditions in the park in 2009 because he and Janice "started losing little amenities," including cable television. They began to see homes that were uninhabited and a progressive escalation of homes being removed from the park. It appeared no one was maintaining or taking care of the abandoned homes. Keith advertised their home for sale in 2011, but it did not sell.

When the Derelds moved into Terrace View in 2000, they signed a 10-year lease with starting rent of $545.30 per month. In 2009 they received the "114th month increase" under the catch-up provision. They were offered the emergency rent stabilization program but they declined, and they never signed another long-term lease. In March 2013, their monthly rent was $1,499.57. In September 2013 they moved their mobilehome to another park. The total cost of moving the home was $33,463.81.

Jennifer Moore moved into Terrace View with her disabled parents in 1998 when they purchased a home in the park by assuming the sellers' mortgage and 10-year lease. The monthly rent for their home was $525. Moore signed an emergency rent stabilization agreement in 2004 and in 2007 went on a month-to-month rental agreement. She did not want to sign any more documents with Terrace View because she felt they

10

had deceived her about what the amount of her rent increases would be and she could never trust them again.

In 2009, Moore and her parents decided to leave Terrace View and listed the home with a real estate agent. The main reason Moore wanted to sell the home was that the space rent was increasing annually and "was quickly outpacing anything that [she] would be able to afford into the future." She also felt it was no longer safe for her parents to use the pool, and the park was "emptying out." They listed the home for two years but were unable to sell it. Moore accepted that the only way to escape the park was to pay off the home and give it away, but she was unable "to save to put extra money into paying it off quickly and the rents increased at a pace faster than [she] could keep up with." At the time of trial she earned about $3,000 per month and paid $2,000 per month to the park in rent, taxes, and insurance. Her monthly rent was almost $1,600. She felt "trapped" and told people she was "pretty much destroyed financially, emotionally, [and] physically."

Gerri Bevis testified that she lived in Terrace View with her husband David Bevis, her 14-year-old child and her mother-in-law Francis Bevis. They purchased their home in the park in 2001, when the park was "full with lots of children." Their monthly rent when they moved into the home was $665. In 2003, the rent had increased to $802. They tried to sell the home in 2003 because of the rent increases. They listed the home with a realtor and offered to give the buyer a rent credit of $500 per month for the first year—i.e., they would reimburse $6,000 of the purchase price towards first year's rent. Potential buyers looked at the home and expressed interest, but they did not make offers on the house after the Bevises told them how much they were paying in rent.

11

By 2008, the park was almost half empty, and the empty homes were in "disarray." A nearby home that became vacant in 2010 had holes in its skirting and roof. The Bevises signed up for the emergency rent stabilization program from 2008 through 2014 because they could not sell their home and felt they had no choice. Gerri testified that they did not sign the emergency rent stabilization agreement in 2015 because they were "pursuing other options of trying to get out," referring to the present litigation.

In 2006, Rebecca Fullerton-Jones moved into Terrace View with her husband, who was then the "breadwinner." They purchased a home in the park for about $86,000.00. She began to have financial problems after her husband passed away in 2007. She initially loved living in the park but became unhappy living there because of the space rent increases. She signed an emergency rent stabilization agreement in 2011 when she received notice that her rent would increase to $1,411.85 per month. At that point she decided she had to put her home up for sale so she hired a real estate agent. She initially listed the home at $69,000, but lowered the price to $36,000. Potential buyers viewed the home and expressed interest in purchasing it, but they declined to purchase it after Fullerton-Jones told them about the park's annual rent increases and the amount she was paying in rent. Fullerton-Jones offered to sell the home to park management, but they declined.

After the home had been on the market for about a year, Fullerton-Jones decided to move it to another park and sell it there. She accepted an offer to move the home for $8,000, and had the home moved to another park about 10 miles away from Terrace

12

View. She sold the home about five months later in 2015 and received $15,000 from the sale.

Sabino Galvan and his wife Ubelia Galvin purchased a home in Terrace View for $10,000 in 2006. When they moved into the home the monthly space rent was $975 under a long-term lease that expired in 2011. Rent became difficult for the Galvans to pay when it increased to $1,450 per month. They tried to sell their mobilehome "many times." When they asked $16,000 for the home, prospective buyers expressed interest in it until they talked to the park manager about the rent the Galvans were paying. The Galvans looked into moving the home to another park, but they could not afford the cost of moving it and other parks would not accept the home because it was too old.

When their rent increased to $1,704.94, the Galvans fell behind on rent payments and the park served them a three-day notice to pay rent or quit. They were unable to pay the rent they owed so the park gave them 60 days to move out and then obtained a judgment against them. As part of the judgment, the park gave them another chance to sell the home and give the sale proceeds to the park. Galvan listed the home with a broker for $18,000. They received offers, but the prospective buyers declined to purchase the home when they learned about the rent, even when the Galvans lowered the price of the home to $10,000. The park eventually evicted the Galvans from their home. At the time of trial, their church pastor was letting them stay in two rooms in their church.

Larry and Joyce Summers moved into Terrace View in 2006 when they bought a mobilehome in the park that was manufactured in 1970. They signed a 10-year lease

13

when they moved in. After a couple of years in the park that "were pretty nice," they became unhappy living at the park because they started getting improper notices to maintain their premises, such as notices concerning things that were not on their property or telling them to remove weeds that were not weeds. They were also upset because people were continually moving out of the park and they were worried about rent increases. They considered trying to sell their home or move it out of the park, but they did some research and learned that under state law, the home was too old to move unless it was moved out of California.

It became difficult for the Summerses to pay rent, but they did not sign emergency rent stabilization papers from 2007 to 2011 because they did not want to give up the right to go to court. However, in 2013 they signed an emergency rent stabilization agreement because they were having a financially "struggling year." After falling behind on their rent, they tried to make a late payment to come current, but the park wouldn't accept their check, even with a late fee added to the payment. Instead, the park made them agree to a catch-up plan that involved paying two months' rent for 10 months and signing a release. They thought they had to sign the park's settlement and release agreement or they would have to move out. They signed a new five-year lease in 2016 in addition to an arbitration agreement and right of first refusal agreement because they could not afford to move and knew they could not sell their mobilehome. They thought they were required to sign all of the documents. Their starting rent at the park was $1,065 per month and their rent at the time of trial was $1,811.48.

14

Vicki Mast and her husband Phillip Mast purchased a new home in Terrace View in 2002 for $86,000. They signed a 10-year lease with starting rent of $775 per month. In June 2012, their rent was $1,222.72. In 2009 they noticed "more and more people leaving the park" and more empty homes and vacant spaces. Some of the empty homes that remained vacant over time were in "disrepair, falling apart." The home next to their home had been vacant for at least five years.

The Masts listed their home for sale with a real estate agent in April 2016 at the price of $72,000 but did not get any interested buyers. The agent asked the park for a rent quote to give to potential buyers and was informed the monthly rent a buyer would pay would be $1,470. The Masts knew they would not get a buyer who could pay cash for their home and be willing to pay the high rent, so they obtained bids to move the home. They had difficulty finding a vacant spot for the home and did not have the $27,000 it would cost to move it. They were concerned that they would not be able to afford to stay there much longer.

The Masts agreed to emergency rent stabilization every year it was offered to them until 2014. They rejected emergency rent stabilization in 2014 and became month-to-month tenants because they were participating in the instant lawsuit. When they became month-to-month tenants their rent increased 17 percent to $1,400. If they had accepted emergency rent stabilization in 2014 their rent would have been $422 less.

Terry McMeans bought a home in Terrace View in 1986 for $33,000. Space rent then was $239 a month and the park was full. He never signed a lease but eventually signed an emergency rent stabilization agreement. In 2009, his monthly rent was $1,200

15

with emergency rent stabilization and $1,300 without.  He became concerned about the condition of the home next to his after it became vacant.

In 2012 he had an opportunity to purchase a home in Florida but was unable to do so then because his rent was too high for him to qualify for a loan.[7]  At the time of trial his monthly rent was $1,689.  He felt an urgency to move and had tried to sell his home for about a year but was unsuccessful.  Potential buyers looked at the home and liked it, but a buyer's rent would have been 2 percent higher than the rent McMeans was paying.  McMeans had also talked to someone about moving the home, but was told the home was too old to move.  A person from Mexico offered to take the home for free and move it to Mexico, and the park had offered to buy it for $1,000.  McMeans had an agreement with the person from Mexico to remove the home from the park.  Whether he moved the home or sold it, he intended to leave the park and move to Florida.

Christine Johnson-Fowler moved into Terrace View in 1993.  She and her husband purchased a new home in the park for "somewhere in the $80,000 range" and paid off the loan on the home.  They became unhappy living in the park when "it started emptying out[.]"  They put the home on the market and someone gave them an offer to buy the home, but they withdrew the offer after talking to park management about the rent.  Both homes on either side of Johnson-Fowler's home became empty—one for about four and one-half years, the other for about five and one-half years.  In addition she testified that

---

7    McMeans later testified that he wanted to leave the park as soon as possible because he had "managed to purchase property in Florida where I can afford to live."

"all of the rest of the homes down the street from us, with the exception of one, are empty spaces. There's no one in them."

Johnson-Fowler signed up for emergency rent stabilization after separating from her former husband in 2009. She participated in emergency rent stabilization again in 2010, 2011, and 2014 but not in 2012 or 2013. She decided to stop signing emergency rent stabilization documents in 2015 after joining the instant lawsuit. She had been a month-to-month tenant since May 2013 and her rent at the time of trial was $1,471.98. She and her current husband had explored the option of moving the home out of the park, but it was not a realistic option because they could not afford the estimated cost of $35,000-$40,000 to move the home, she had two children living at the home, and they would be without a home for two months. She felt trapped, although she noted the park was "starting, finally, to fill up some of the homes, which is nice."

Finally, Juanita Colley testified that when she moved into Terrace View in April 2005, there were no empty lots and only two homes for sale. She bought a home in the park for $96,000 and assumed a long-term lease from the seller with monthly rent of $1,013. By 2009, the park was almost half empty. One of the empty homes on her street was in a state of disrepair with overgrowth of weeds around it for several years until the park "started fixing it up" in 2013 or 2014. Another home across the street from her home was vacant between 2006 and 2015 and in disrepair with overgrown weeds around it until the park painted it and did repair work on it in 2015. After it was fixed up a "nice young couple" moved into the home.

17

Colley tried to sell her home in 2011 for $59,000. She received offers of $49,000 and $39,000, but neither of the potential buyers finalized the purchase after they were provided rent information.

Colley participated in the emergency rent stabilization from 2008 through 2013. She stopped participating in the program after 2013 because she did not want to give up her right to litigation. She signed a new three-year lease in 2011 after getting a 114th-month rent increase of about 14 percent or $170. She thought she had no choice but to sign the lease because she could not sell her home and could not afford to move it out of the park. In 2014 her rent increased by almost $157 when she got a 30-month rent increase of 12 percent. She went to a month-to-month tenancy after that increase because she was participating in the present lawsuit and did not want to give up her right to litigation. Her monthly rent at the time of trial was $1,600 a month.

*The Present Lawsuit*

The homeowners filed this action in July 2013. The operative first amended complaint, filed in December 2013 as a class action, included the following 12 causes of action: (1) nuisance, (2) breach of contract, (3) illegal change of use of park, (4) negligence, (5) intentional interference with property rights, (6) breach of covenant of good faith and fair dealing, (7) breach of statutes, (8) breach of unfair competition law, (9) breach of warranty of habitability, (10) breach of the covenant of quiet enjoyment, (11) elder financial abuse (by senior citizen plaintiffs), and (12) rescission and declaratory and injunctive relief. The causes of action are largely based on allegations that defendants failed to maintain the park in "good working order and condition" and

18

charged the homeowners unreasonably high space rent. The first amended complaint named Terrace View Partners, LP, as a defendant. Thomas T. Tatum, Jeffrey A. Kaplan, and Mobile Community Management Company were later substituted for Doe defendants.

The homeowners filed a motion for class certification and the court denied the motion in August 2015. As noted, the parties and the court agreed to try the case in phases, with the first phase involving 10 spaces in Terrace View and the 16 plaintiffs who are parties to this appeal.

Before trial, the parties stipulated that the court would rule on a number of legal issues before a jury was impaneled at trial, including the legality of certain provisions in defendants' leases and emergency rent stabilization agreements, and whether the rent increase provisions in the leases were unconscionable. The parties filed pretrial motions requesting specific rulings on those legal issues. In March 2016, the court issued an order on the parties' pretrial motions.

Regarding the unconscionability of the rent increase provisions in defendants' leases and the legality of the emergency rent stabilization agreements, the court ruled as follows: "The Court finds that Defendants' rent increase provisions (including, but not limited to, annual increases, catch-up provision increases, and pass through cost provision increase) are not procedurally unconscionable. The Court finds the leases are lawful and not adhesion contracts. As to the lease provisions concerning the right of first refusal, release, and the arbitration provision, the Court finds these provisions violated the

19

[MRL]. Those provisions are severed from the lease and amendments, and the remainder of the agreements are deemed to be enforceable as a matter of law."

The court further ruled that paragraphs 56.1 and 56.2 in defendants' leases and paragraph 5.1 in defendants' lease amendments were unlawful provisions. Paragraph 56.1 imposed a one-year limitations period for any claims or actions by tenants against the park arising out of the tenancy, and paragraph 56.2 set forth a list of claims and causes of action that were subject to the one-year "statute of limitation in paragraph 56.1." Paragraph 5.1 of the lease amendments released the park from liability "for any damage, injury, loss, expense or inconvenience to any person or property caused by any use of the Park or Resident's Space or by any defects in any improvements or failure of services or amenities, or arising from any other cause, unless resulting from Park's active negligence or willful acts."

The court also ruled that paragraph 34 in defendants' leases and paragraph 9.1 in their lease amendments were unlawful. Paragraph 34 provided that enforcement of the lease agreement and park rules was a private matter between the park and resident and that "the enforcement or the lack thereof shall not result in any damage or injury to, or claim by Resident." Paragraph 9.1 made the resident, rather than the park, responsible for maintaining proper drainage from the mobilehome space. The court severed the unlawful provisions from the lease agreements or amendments and found the remaining provisions were "enforceable as a matter of law." Defendants do not challenge the court's rulings regarding the unlawful provisions on appeal.

20

Defendants filed a pretrial motion to bifurcate the trial of plaintiffs' claims for illegal change of use of the park and unfair competition on the grounds plaintiffs were not entitled to a jury trial on those claims because they sought equitable remedies, and presenting evidence to the jury on them would be unduly prejudicial. The court denied the motion.

After plaintiffs presented their evidence, defendants moved for nonsuit on plaintiffs' causes of action for unfair business practices (violation of UCL), breach of warranty of habitability, illegal change of use, and breach of the covenant of good faith and fair dealing. The court granted defendants' motion for nonsuit as to the illegal change of use claim and denied the motion as to the other causes of action.

The jury returned a special verdict form for each of the 10 spaces at issue in the trial. The jury found the defendants were liable to the plaintiffs residing on each of the 10 spaces under the following theories or causes of action as they were specified on the verdict forms: (1) intentional interference with property rights, (2) breach of the covenant of good faith and fair dealing, (3) nuisance, (4) breach of contract/breach of the

covenant of quiet enjoyment,[8] and (5) negligence/negligence per se.  As to the five senior plaintiffs who asserted the cause of action for elder financial abuse, the jury found defendants did not commit financial elder abuse.  Where the jury found defendants liable on a cause of action or theory, the verdict form asked whether defendants' breach or wrongful act in question was "a substantial factor in causing harm to [the plaintiff or plaintiffs.]"  The verdict forms did not ask the jury to specify the amount of damages it was awarding a particular plaintiff or group of plaintiffs under any particular theory or cause of action.  Instead, it asked the jury to set forth the total amount of economic damages it was awarding to each plaintiff or set of plaintiffs living on a particular mobilehome space and the amount of noneconomic damages it was awarding to each individual plaintiff.

---

[8]     Although the verdict forms combined breach of contract and breach of the covenant of quiet enjoyment under the single heading:  "BREACH OF CONTRACT/BREACH OF THE COVENANT OF QUIET ENJOYMENT," the forms also treated the two theories as being separate.  The forms first asked the jury whether defendants breached their contract with the plaintiff or plaintiffs identified on the form. If the jury answered "yes," they were directed to answer the question whether defendants breached the covenant of quiet enjoyment with the plaintiff or plaintiffs.  If they answered "no" to the first question (finding no breach of contract), they were directed to go to the first question under the next cause of action (negligence/negligence per se) and not decide whether defendants breached the covenant of quiet enjoyment.  Only if the jury found the defendants breached both their contract with the plaintiffs and the covenant of quiet enjoyment was the jury directed to answer the question, "Was DEFENDANTS' breach of contract or breach of the covenant of quiet enjoyment a substantial factor in causing harm to [the plaintiff]?"  If the jury answered "yes" to whether defendants breached their contract with plaintiffs but answered "no" to whether defendants beached the covenant of quiet enjoyment with plaintiffs, it was directed to go to the next theory or cause of action.  As to each of the 16 plaintiffs, the jury found defendants liable for both breach of contract and breach of the covenant of quiet enjoyment.

22

The jury returned separate verdicts awarding punitive damages. As with economic damages on the compensatory damage verdict forms, the punitive damages forms called for the jury to award punitive damages separately to each of the 10 spaces, such that where more than one plaintiff lived in a space, the award for that space was shared by all the plaintiffs living on the space. For each space, the jury was asked to consider making three separate awards—one against defendant Tatum, one against defendant Kaplan, and one against defendants Terrace View Partners, LP and Mobile Community Management Company together. The jury returned the same award for each of the 10 spaces: $3.2 million against Kaplan; $2 million against Tatum; and $500,000 against Terrace View Partners, LP and Mobile Community Management Company, for a total punitive damages award of $57 million. As noted, the court issued a postjudgment order reducing the amount of punitive damages awarded to each of the spaces to match the space's award of compensatory damages, making the total amount of punitive damages awarded against defendants $1,289,000. After entering the judgment, the court awarded attorney fees to plaintiffs in the amount of $2,385,773.70 plus costs of $56,417.72.

*The Court's Ruling on Plaintiffs' UCL Claim*

Outside the presence of the jury during trial, the court heard argument on plaintiffs' cause of action under the UCL. On August 4, 2016, after the jury was discharged, the court issued a written order entitled "ORDER AFTER TRIAL ON EQUITABLE ISSUES," in which the court reversed its earlier ruling that the catch-up rent increase provision in the park's leases was not unconscionable. The court stated: "In a previous motion in limine decided by this court on March 11, 2016, this court ruled that

23

the catch-up provision was not procedurally unconscionable. Now, after hearing all the evidence presented at trial, the court finds the catch-up provision is unconscionable." The court found the catch-up provision was both procedurally unconscionable, based on surprise, and substantively unconscionable "in that the provision is one-sided, unreasonable, and lacks justification." The court enjoined the defendants from enforcing the catch-up provision in the current leases or using the catch-up provision in future leases.

In response to the court's reversal of its earlier ruling, defendants filed a motion for "clarification and/or reconsideration" of the court's August 4, 2016 order. At oral argument on the motion, the court expressed concern about reversing its pretrial ruling that the lease catch-up provision was not unconscionable. The court stated, "Here's my concern. And it puts—at least in the Court's mind, it put the defendant in a tough position. I made a previous court ruling and then right after trial I just reversed that ruling. [Defense counsel is] being very polite, but that's what I did." The court added, "And, then, you know, thanks, Judge. But had we known how you were going to rule the first time, maybe we would have presented some other evidence. And that's a real concern, counsel. It just—you know, that's on my shoulders, I understand that."

In November 2016, the court issued an "ORDER AFTER RECONSIDERATION OF COURT'S RULING ON EQUITABLE ISSUES." In that order, the court ruled that the catch-up provision violated the UCL because it was unfair; the court did not find the provision was unconscionable. The court did not enjoin use of the catch-up provision but

24

ordered defendants to disclose information regarding the three highest rents in the park to future and present residents.

Defendants filed an ex parte application requesting further clarification of the court's ruling and the court held another hearing on the matter. The court informed the parties that it decided to change its posttrial finding that the catch-up provision was unconscionable to a finding that it was unfair, stating: "And hopefully that makes it consistent with my previous ruling back in March [that the provision is not unconscionable]." The court concluded, "Unfairness is what it's going to be based on, not unconscionability. Applies only to Terrace View. And everybody gets to know the three highest rents."

On December 19, 2016, the court issued its final "*AMENDED* ORDER AFTER RECONSIDERATION OF COURT'S RULING ON EQUITABLE ISSUES." The court found "the catch-up provision contained in the defendants' leases, as currently being used, violates [the UCL]." The court found the provision "to be unfair and unreasonable."[9]

_____

9    The court explained: "Defendants failed to disclose material facts (i.e., the three highest rents) to plaintiffs at the time the defendant presented the plaintiffs with lease agreements. The plaintiffs on long term leases could not foresee the amount of the catch-up provision increase at the time they entered into the lease. The undisputed evidence produced at trial was that the catch-up provision could not be calculated by the plaintiffs at the time they signed the lease. Also, as to prospective new tenants/leases at the park, the catch-up provision could not be calculated in advance. The court finds the defendants did not provide the plaintiffs with readily available information about what the catch-up provision amount was at the time of the signing of the lease. The defendants could have provided the plaintiffs with what the three highest rents were being charged in the park prior to the time of signing the lease. Thus, the plaintiffs could have determined the arithmetic average of those three rents and had some indication of how much their rent could be increased.

The court ordered defendants to "disclose available information regarding the three highest rent rates [at the time] of contracting of leases." The court further ordered defendants to disclose available information regarding the three highest rents to any park resident upon request and to "individuals assuming a resident's pre-existing lease agreement." The court vacated its August 4, 2016 order on plaintiffs' UCL claim and reinstated its March 11, 2016 order finding the catch-up provision was not unconscionable. On the same day it entered its final order on plaintiffs' UCL claim, the court entered its "AMENDED JUDGMENT" reflecting the jury's verdict and the court's rulings that lease and lease amendment provisions were unlawful, as noted above.[10]

DISCUSSION

I. *Defendants Cannot Be Held Liable for Charging Rental Rates That the Parties' Leases and Rental Agreements Allowed*

The record overwhelmingly supports the conclusion that the main basis for the jury's compensatory and punitive damage awards to plaintiffs was the high space rent plaintiffs paid to defendants. The homeowners' operative first amended complaint included allegations of unreasonably high rent under causes of action for nuisance, illegal change of use of park, intentional interference with property rights (by reference to the

---

"The court finds the catch-up provision as currently being used is unfair in that the plaintiffs or any future tenants have no way to project what the three highest rents would be at the time the catch-up provision applies. The court also finds the catch-up provision is unfair for a future tenant not to be given available information maintained by the defendants that would give the new tenant some ability to determine what the new rent would be."

10    The judgment does not reflect the court's order reducing the jury's punitive damage awards.

26

illegal change of use cause of action), breach of implied covenant of good faith and fair dealing, breach of the UCL, breach of the covenant of quiet enjoyment, elder financial abuse, and rescission and declaratory and injunctive relief.

In their 12th cause of action for rescission and declaratory and injunctive relief, the homeowners requested that defendants "return all rents they were forced to pay in excess of the fair market value of their spaces." The homeowners further sought "consequential damages caused by the unconscionable rent terms, including interference with the sale of their homes, loss of their homes, and, emotional distress." In their allegations of an "actual controversy" for purposes of declaratory relief, the homeowners alleged their "right to continued tenancies in the Park at a rent level that corresponds to the reasonable worth of their tenancies." The prayer for relief under the 12th cause of action requests a declaration of the homeowners' rights and obligations respecting their "continued tenancies, leases and rental agreements in the Park and rent levels, and sale and use of their mobilehomes and a declaration of Defendants' duties[.]"

At trial, the plaintiffs testified about high rent and the effect it had on their lives, as noted in our statement of facts above. Plaintiffs' main damages expert, commercial appraiser Robert Caringella, testified regarding his comparison of the rent charged at Terrace View to the rent charged at 10 comparable parks in the Lakeside area. He showed the jury a chart that listed rents paid in other parks in the area, and testified that the average rent in nine of the parks he visited (plus "four or five other parks") was $850. He further testified that market rent for Terrace View was $900 to $1,000, and that this "assumes [Terrace View is] well·managed, there's no problems with maintenance,

27

there's·no issues with water, sewer, electrical, that this is a·nice place to live." Caringella did not offer any opinion on damages that plaintiffs suffered as a result of defendants' alleged failure to maintain the park in good working order and condition.

Caringella also testified about the negative effect of high space rent on a mobilehome's value, stating, "It can destroy the value of the home if rents are so high." He testified that some of the 10 plaintiff homes had "excessively high rent and that has a negative impact on home value." He prepared charts that quantified the diminution of value of each of the 10 homes by comparing the value of the home in Terrace View to what its value would be if it were in a park that charged market rental rates. Plaintiffs did not present any evidence of economic damages other than Caringella's testimony and charts, and evidence that it cost the Derelds $33,463.81 to move their home out of Terrace View.

The court instructed the jury that plaintiffs sought "overpayment of rent" as both contract and tort economic damages generally, and that they could be awarded damages for overpayment of rent under the following specific theories: nuisance, breach of contract, negligence, intentional interference with property rights, breach of implied covenant of good faith and fair dealing, breach of the covenant of quiet enjoyment, and elder financial abuse. The court also instructed that although plaintiffs sought damages from defendants under multiple legal theories, "each item of damages may be awarded only once, regardless of the number of legal theories alleged."

In closing argument to the jury, plaintiffs' counsel focused mainly on defendants' rent increase practices. He argued, "When you have the right to set the rent and

28

you're·the only one that does it, you have to set a fair rent, and you don't put illegal language in the contract or make people sign illegal documents, and if they refuse to do it you charge them or gouge them money." He further argued that charging unreasonably high rent constituted intentional interference with plaintiffs' property rights, stating, "You're forced to hang on as long as you can because you can't get out unless you walk away from your home or, if you're fortunate like the Masts, you have a 401(k) you can hit, and you can move. [¶] But other than that, you're there or you're going·to lose your home. . . . That's the ultimate interference. That's stealing. Ladies and gentlemen, that's flat-out stealing."

Counsel also argued that charging unreasonably high rent constituted negligence, stating, "Negligence is the failure to use reasonable care to prevent harm to oneself or others. [¶] A person can be negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonable, careful person would do in the same situation. [¶] "Well, what's reasonable care? You maintain your lots. You maintain your property. *When you set rents, you set a reasonable rent.* Because, you know, if you don't, you're going to cause harm. That's what a reasonably prudent person does. . . . All these things are . . . acts of negligence." (Italics added.)

Plaintiffs' counsel directed the jury to calculate damages by subtracting Caringella's market rent amount from the rent the plaintiffs had paid. He explained that he calculated the total rent paid during the relevant time period for each of the plaintiffs' spaces and then asked the jury to subtract what plaintiffs would have paid if they had paid

29

"reasonable rent" of $850 during that period, explaining, "[t]hese are the damages [] for the gouging of the rent."

In rebuttal, plaintiffs' counsel argued that defendants' exercise of discretion under paragraph 11.3 of the lease to require a prospective buyer of a home in the park to assume the seller's lease and to pay the same rent or 10 percent higher rent than the seller is paying "is the biggest interference with your property rights. It's a good faith and fair dealing violation. It's negligence. It's everything we talked about. It's criminal. It traps people. It's how he takes their home. It's how he traps them. It's that provision that's the most dangerous, 11.3."

As noted, the jury's special verdict found defendants were liable and caused plaintiffs harm under the following theories or causes of action: (1) intentional interference with property rights; (2) breach of covenant of good faith and fair dealing; (3) nuisance (finding defendants "substantially fail[ed] to enforce the Park's rules and regulations in the Park"); (4) breach of contract/ breach of the covenant of quiet enjoyment [combined like this on verdict form]; (5) negligence/negligence per se. Given the instructions that allowed the jury to award overpayment of rent as damages under each of those theories, and the argument of counsel that urged the jury to do so, the jury undoubtedly awarded overpayment damages to plaintiffs under at least one and possibly all of those theories. Although the court instructed the jury that it could only award those damages once, the jury was not precluded from deciding they could be awarded under more than one or even all of the theories under which they found defendants liable.

30

We recognize that "overpayment of rent" could refer to a rented property not being worth the amount of rent being paid because a nuisance created by defendant negatively affects the property's habitability or the tenant's quiet enjoyment of the premises. However, plaintiffs' primary nuisance theory was that defendants failed to maintain the park in good working order and condition and the jury expressly rejected that theory on the special verdict forms. Although the jury found in favor of plaintiffs on their secondary nuisance theory based on defendants' failure to follow their own park rules that required them to maintain their park-owned vacant mobilehomes in good condition, and presumably some percentage of the jury's award is attributable to that claim, it is inconceivable that this secondary nuisance claim was the main basis for the jury's award of $1,289,000 in compensatory damages and $57 million in punitive damages. The twofold gravamen of plaintiffs' case clearly was that: (1) defendants' failure to maintain the park in good working order and condition created a nuisance that caused them compensable harm and (2) defendants imposed unreasonably high space rent increases that some plaintiffs could not afford and that made it difficult or impossible for plaintiffs to sell their mobilehomes. In light of the jury's rejection of plaintiffs' primary nuisance claim based on failure to maintain the park, it is reasonable to conclude that the main basis for the jury's awards of compensatory and punitive damages was the high rental rates plaintiffs had paid or were paying.

31

*Rent May Not Be Limited to a Lower Rate Than a Rental Agreement Allows in the*
*Absence of a Rent-control Ordinance*

"In jurisdictions *not* subject to local rent controls, landlords have virtually unlimited discretion in setting the amount of rent for new tenants, regardless of the reason the particular rental unit was vacated.  Likewise, except as otherwise stated in a tenant's lease, and provided proper statutory *notice* is given . . . , there is generally no limit on the amount by which rents on existing tenancies may be increased."  (Friedman et al., Cal. Practice Guide:  Landlord-Tenant (The Rutter Group 2018) ¶ 2:700, p. 2D-1.)

"Although the [MRL] regulates in detail the relations between the owners of mobilehome parks and their residents, it is not a rent control law."  (*Vance v. Villa Park Mobilehome Estates* (1995) 36 Cal.App.4th 698, 702 (*Vance*).)  "No provision of the [MRL] precludes a homeowner and a park operator from agreeing to a rental rate that escalates incrementally over the term of the lease.  [Civil Code s]ection 798.16 provides, '[t]he rental agreement may include such other provisions permitted by law, but need not include specific language contained in state or local laws not a part of this chapter.'  In other words, what is not prohibited is permitted.  The act contemplates by its terms that rent is controlled by contract and may be determined by any formula acceptable to the parties to the rental agreement."  (*Id*. at p. 708)

Accordingly, where rented property is not subject to a rent control ordinance, as a general rule the property owner cannot be held civilly liable for charging an amount of rent that is expressly allowed under the parties' written lease agreement or is not

precluded by law under a month-to-month rental agreement.[11] With this principle in mind, we consider the various theories under which the jury was instructed that it could award overpayment of rent as economic damages.

*Intentional Interference with Property Rights*

Plaintiffs' position is that defendants' charging unreasonably high rent subjects them to liability in tort for intentional interference with property rights. There is not a clearly defined cause of action in tort in California for intentional interference with property rights. In *Barkett v. Brucato* (1953) 122 Cal.App.2d 264 (*Barkett*), the Court of Appeal acknowledged the existence of a tort cause of action for "willful wrongful eviction, that is, the breach of the covenant of quiet enjoyment, accomplished by a series of intentionally annoying acts designed to compel the tenant to vacate. Such a tort (as distinguished from an action for breach of the covenant of quiet enjoyment) is recognized in the law. Section 822 of the Restatement of Torts defines this tort as follows: [¶] 'The actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if, [¶] (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and [¶] (b) the invasion is substantial; and [¶] (c) the actor's conduct is a legal cause of the invasion; and [¶] (d) the invasion is either [¶] (i) intentional and unreasonable; or [¶] (ii) unintentional and

_____

[11] Although plaintiffs state that homeowners with month-to-month tenancies have no written agreement with defendants, the record contains a written month-to-month agreement. Paragraph 4.2 of that agreement states: "The amount of Resident's rent may be changed at any time upon written notice in accordance with law."

otherwise actionable under the rules governing liability for negligent, reckless or ultra-hazardous conduct.' " (*Barkett*, at pp. 274-275.)

In *Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873 (*Ginsberg*), the appellate court observed that courts have allowed *tort* damages for breach of covenant of quiet enjoyment only where there has been a wrongful eviction—i.e., where the landlord's acts or omissions affected the tenant's use of the property and compelled the tenant to vacate the property. (*Id.* at pp. 897-898.) The *Ginsberg* court noted that "some courts have implicitly or explicitly indicated a tenant may recover punitive damages in connection with a claim for breach of the implied covenant of quiet enjoyment, or identified the claim as a tort. However, all of those cases describe wrongful eviction claims. In other words, they are cases in which the implied covenant of quiet enjoyment is breached by a wrongful eviction." (*Id.* at pp. 898-899.) "[W]hen the landlord has breached the implied covenant of quiet enjoyment, but the tenant remains in possession of the premises, the tenant's remedy is to 'sue for breach of contract damages.' " (*Id.* at p. 902.)

In summary, California case law has recognized a tort cause of action for wrongful eviction, including breaches of the covenant of quiet enjoyment that compel a tenant to vacate, whereas breach of covenant of quiet enjoyment that does not result in a wrongful constructive or actual eviction is a breach of contract. (*Ginsberg, supra*, 205 Cal.App.4th at pp. 898-902.)

Although under California law there is no clearly defined cause of action for intentional interference with property rights absent a constructive eviction, the jury received a special instruction at trial that specified the elements of plaintiffs' interference

34

cause of action as follows: 1. Plaintiffs had a property right or privilege with respect to the use, enjoyment or sale of their property. [¶] 2. Defendants wrongfully interfered with plaintiffs' right. [¶] 3. Defendants' conduct caused damage to plaintiffs."

Two additional special jury instructions specified prohibited interference. The first included the statement: "It is unlawful for a mobilehome park owner to interfere with a mobilehome park resident's right to sell his or her home in place." The second stated: "The management of a mobilehome park may require the approval of a purchaser of a mobilehome within his or her park. The management cannot refuse to allow the sale to go forward if the prospective purchaser has the financial ability to pay the space rent and charges unless the park management reasonably determines that, based upon the prospective purchaser's previous tenancies, that such purchaser will not follow the rules of the park."

Defendants essentially argue there was insufficient evidence to support the verdict on plaintiffs' cause of action for intentional interference with property rights because the only evidence supporting that verdict was evidence that plaintiffs' rent was above market rent and, as a matter of law, plaintiffs' high rent cannot constitute interference with their property rights because the rental agreements allowed defendants to charge that rent.

Plaintiffs argue the tort of intentional interference with property rights lies when a mobilehome park owner interferes with tenants' right to sell their mobilehomes by raising rent to levels that render the homes unsalable. They argue that evidence of interference included "evidence that [defendants] purposely sabotaged [plaintiffs'] fundamental property right to sell their homes through prohibitively high rent, unreasonable

35

discretionary rent assignments, lower rent rates for [defendants'] buyers, high vacancy rates, blighted homes, and unlawful rights of first refusal."

We agree that the high rental rates plaintiffs paid cannot constitute tortious interference with their property rights. We are aware of no authority that allows an award of tort and punitive damages against a landlord for charging above-market rental rates that are expressly allowed by the parties' lease agreement or by law applicable to month-to-month tenancies. Regarding high vacancy rates, blighted homes, and unlawful first rights of refusal, defendants correctly observe that no evidence was presented at trial that these circumstances interfered with the plaintiffs' attempt to sell their homes. Nor was there any evidence that defendants prevented a sale by refusing to allow it to go forward. The only reason cited in various plaintiffs' testimony for their inability to sell their homes in place was the high rent the prospective buyers would have to pay.

*Breach of the Implied Covenant of Good Faith and Fair Dealing*

Defendants contend the court gave an erroneous special instruction regarding the implied covenant of good faith and fair dealing that allowed the jury to find the implied covenant was breached if a plaintiff's lease agreement was not a "good deal." Defendants further contend the evidence was insufficient to support the verdict on plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing under the correct legal standards. We conclude the jury instructions, evidence presented at trial, and plaintiffs' counsel's closing argument allowed the jury to improperly award amounts the plaintiffs paid above Caringella's market rent figure of $850 per month as damages for

36

defendants' breach of the implied covenant of good faith and fair dealing in the parties' rental agreements.

" ' "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ' " (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (*Carma*).) "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. [Citations.] However, defining what is required by this covenant has not always proven an easy task." (*Id.* at p. 372.)

It is well settled that "an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.) In *Carma*, the California Supreme Court noted: "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] 'The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." [Citation.]. . . . [¶] As to acts and conduct authorized by the express provisions

37

of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.' " (*Carma, supra*, 2 Cal.4th at p. 374.) Accordingly, defendants here cannot be held liable for breach of the implied covenant of good faith and fair dealing by implementing rent increases that the parties' written lease agreements expressly authorized.

At plaintiffs' request and over defendants' objection, the court gave Special Instruction No. 66, which stated: "A party with the unilateral discretion to set an open term in a contract must do so under the standard of good faith and fair dealing. This means that the party with the discretion to set a price term in a contract or make a decision affecting the rights of the other contracting party must do so in an objectively reasonable manner." This special instruction was derived from *Automatic Vending Co. v. Wisdom* (1960) 182 Cal.App.2d 354 (*Automatic Vending*), in which the Court of Appeal concluded that a contract giving one party unilateral discretion to vary the amount of commissions the other party was required to pay under the contract was not unenforceable as illusory because the implied covenant of good faith and fair dealing limited the commissions to a reasonable amount. (*Id.* at pp. 357-358.) The *Automatic Vending* court stated that " 'the fact that one of the parties reserves the power of varying the price or other performance is not fatal if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable. ' " (*Id.* at p. 357.) The court further stated that " '[w]here a contract confers on one party a discretionary power affecting the

38

rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing. [Citations.]' . . . Such being the applicable law, the power given to the Automatic Vending Company to change the commission rates upon written notice would impose a duty upon it to exercise that discretion in good faith and in accordance with fair dealings and fix the commissions in such amount as the object of the contract is reasonably worth. Therefore, it cannot be said that the contract in question is illusory, lacks mutuality of obligation, or is void." (*Id*. at p. 358.)

" 'The admonition has been frequently stated that it is dangerous to frame an instruction upon isolated extracts from the opinions of the court.' [Citation.] 'Judicial opinions are not written as jury instructions and are notoriously unreliable as such.' " (*Merritt v. Reserve Ins. Co*. (1973) 34 Cal.App.3d 858, 876, fn. 5; accord, *Merlo v. Standard Life & Acc. Ins. Co*. (1976) 59 Cal.App.3d 5, 17.) " '[T]he opinion of a court is always to be read in connection with the facts of the case in which it is given, and it may often occur that in its opinion [the court] will use expressions either by way of argument or illustration, which are correct in their application to the case before it, but would be inapplicable in many other cases.' " (*Schance v. H. O. Adams Tile Co*. (1955) 131 Cal.App.2d 549, 555, quoting *Pearce v. Boggs* (1893) 99 Cal. 340, 343-344.)

Special Instruction No. 66 illustrates the risk of basing special jury instructions on case language. Read in context, it is clear that *Automatic Vending* court's reference to "rights of the other" was a reference to the other contracting party's rights *under the contract*. However, the second sentence of Special Instruction No. 66 overbroadly instructs that a "party with the discretion to set a price term in a contract *or make a*

*decision affecting the rights of the other contracting party* must do so in an objectively reasonable manner." (Italics added.) The jury could reasonably interpret the second sentence to mean that when a contract gives a party discretion to make *any* decision that affects *any* rights of the other party, the party is liable for breach of the implied covenant of good faith and fair dealing if the party makes an objectively unreasonable decision. The jury could accordingly conclude defendants breached the implied covenant of good faith and fair dealing by setting rental rates that were unreasonably high, because the high rates interfered with plaintiffs' property right to sell their homes in place, even though the rental agreements authorized defendants to set those rates.

The jury would find support for that interpretation in plaintiffs' counsels' closing argument. Counsel began by articulating the gravamen of plaintiffs' case as follows: "Why are we here? We're here because a defendant failed to follow some basic, simple rules, maintain their property. [¶] *When you have the right to set the rent and you're·the only one that does it, you have to set a fair rent*, and you don't put illegal language in the contract or make people sign illegal documents." (Italics added.)

Counsel later argued: "And the judge gave you this jury instruction. It's number 66. And it says a party with the unilateral discretion to set an open term in a contract must do so under a standard of good faith and fair dealing. [¶] This means the party with the discretion to set the price term in the contract or make a decision affecting the rights of the other contracting party must do so in an objectively reasonable manner. [¶] So the question is, *when they set the rents for these month-to-month people and to the other residents, was it reasonable*?" (Italics added.) Counsel then noted Caringella's testimony

40

that the average mobilehome monthly space rent in the area was $850 and compared that rent to Moore's monthly rent of $2,000, stating, "That's patently unreasonable. Who can pay that?"

Plaintiffs argue that *Automatic Vending* is on point because like the party's unilateral discretion to set commission rates in that case, defendants here had unilateral discretion to set rental rates for month-to-month tenants and could increase rates by any amount at any time. Consequently, plaintiffs argue, defendants were required by the implied covenant of good faith and fair dealing to set reasonable rates.

We conclude there was no evidence that defendants breached the implied covenant of good faith and fair dealing in setting rental rates for month-to-month tenants. As noted, the *Automatic Vending* court observed that " 'the fact that one of the parties reserves the power of varying the price or other performance is not fatal if the exercise of this power is subject to prescribed or implied limitations, *as that the variation must be in proportion to some objectively determined base or* must be reasonable. ' " (*Automatic Vending, supra*, 182 Cal.App.2d at p. 357, italics added.) In other words, it is unnecessary to invoke the implied covenant of good faith and fair dealing to limit a contracting party's discretion affecting the contractual rights of the other party if that discretion is subject to other prescribed or implied limitations, such as being in proportion to an objectively determined base.

Here, defendants did not impose unpredictable, arbitrary rent increases on their month-to-month tenants; they followed the rent increase formula in the long-term written leases with the exception that the annual increase for a month-to-month tenant was

41

5 percent above the CPI instead of the 4 percent charged under the leases. Thus, the month-to-month rent increases were subject to the implied limitation of 5 percent above CPI and were in proportion to that objectively determinable base formula. Because they were subject to an implied limitation and an objectively determined base, the annual rent increases defendants imposed cannot be deemed to have breached any implied covenant of good faith and fair dealing in the parties' month-to-month rental agreements.

Plaintiffs additionally argue that as to the plaintiffs who rented under written long-term lease agreements, defendants breached the implied covenant of good faith and fair dealing by failing to exercise their sole discretion under paragraph 11.3 of the leases in an objectively reasonable manner. As noted, paragraph 11.3 provides that if the buyer of a mobilehome in the park intends to leave the home in the park, the seller must assign and the buyer must assume the written lease agreement, subject to the park's approval. However, the park has the right to terminate the lease (and offer a new lease with lower rent) or refuse to allow an assignment of the lease. Plaintiffs argue that defendants breached the implied covenant of good faith and fair dealing by offering buyers of park-owned homes new leases with lower, affordable rent while requiring buyers of resident-owned homes to assume the seller's lease with unaffordable high rent, which resulted in residents' being unable to sell their homes. In plaintiffs' words, defendants "exploited their absolute discretion under the rental agreements and leases to give themselves an

42

unfair competitive advantage at [plaintiffs'] expense."[12]  Thus, plaintiffs argue that because defendants had unilateral discretion under paragraph 11.3 of the written leases to offer buyers of plaintiffs' homes lower rent that would enable plaintiffs to sell the homes but refused to do so, they were in breach of the implied covenant of good faith and fair dealing under the reasoning of *Automatic Vending*.

Defendants' discretion over assignment of leases under paragraph 11.3 does not give rise to a valid claim for breach of the implied covenant of good faith and fair dealing.  Paragraph 11.3 expressly gave defendants the right to either require assignment of the lease to a buyer of a home in the park or to terminate the lease and enter into a new lease agreement with the buyer.  The implied covenant of good faith and fair dealing cannot be read to require defendants to take a particular action that is discretionary under the contract when the contract also expressly grants them the discretion to take a different action.  To apply the covenant to *require* a party to take one of two alternative actions expressly allowed by the contract and forego the other would contravene the rule that the

_____

[12]     Plaintiffs' counsel argued to the jury:  "In addition to [defendants' charging month-to-month tenants unreasonably high rent], one of the most egregious things is in paragraph [11.3] of their standard lease. . . .  [¶]  They have 11.3, which is the clause that says if you sell your home, you have to [as]sign this lease.  But the clause also gives the park owner the sole discretion to issue a new lease.  And that language is notwithstanding the foregoing:  [¶]  'Owner reserves the right to terminate this Agreement upon transfer' of the·residen[ce].  'In addition, Owner may, at Owner's sole option, refuse to allow an assignment of this Agreement upon the transfer.'  Okay.  [¶]  So when you have the discretion to when somebody is selling in the lease to issue a new lease or take the assignment, you have to exercise reasonable discretion.  [¶]  And if you know that you're making somebody who can't sell their home pay a rent that's unreasonable just makes the home unsalable and, you know, that home is going to come back to you.  That's not reasonable."

implied covenant of good faith and fair dealing may not be "read to prohibit a party from doing that which is expressly permitted by an agreement." (*Carma, supra*, 2 Cal.4th at pp. 374, 376.) No contractual obligation may be implied if it would obliterate "a right expressly given under a written contract." (*Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 277.) To imply that defendants were obligated under paragraph 11.3 to offer buyers of plaintiffs' homes new leases with lower rent and were prohibited from requiring selling homeowners to assign their leases to the buyer would obliterate defendants' right expressly given under the written leases to require a lease assignment.

In short, Special Instruction No. 66, along with plaintiffs' counsel's closing argument and the evidence, including Caringella's testimony, improperly allowed the jury to assess liability and damages against defendants for breach of the implied covenant of good faith and fair dealing if the jury merely concluded the rent defendants charged plaintiffs under their rental agreements was unreasonably high. Defendants cannot be held liable for breach of the implied covenant of good faith and fair dealing by implementing rent increases that the parties' rental agreements expressly authorized or that were subject to an implied limitation and an objectively determined base, as discussed above.

*Nuisance*

As we discussed, the jury rejected plaintiffs' primary nuisance claim that defendants failed to maintain the park in good working order and condition, but found in favor of plaintiffs on their nuisance claim based on defendants' failure to follow their own

44

park rules that required them to maintain their park-owned vacant mobilehomes in good condition. Although some percentage of the jury's award presumably is attributable to the jury's nuisance finding, we cannot presume the nuisance finding was the main basis for the jury's award of $1,289,000 in compensatory damages and $57 million in punitive damages. Because the jury rejected plaintiffs' primary nuisance claim based on defendants' alleged failure to maintain the park, it is reasonable to conclude that the main basis for the jury's awards of compensatory and punitive damages was the high rental rates plaintiffs had paid or were paying. Accordingly, we cannot sustain the jury's unsegregated compensatory damage award on the ground the entire award could be reasonably viewed as compensation on plaintiffs' secondary nuisance claim.

*Negligence*

On the special verdict form, the jury found defendants liable for "NEGLIGENCE/NEGLIGENCE PER SE." It is unclear what acts or omissions of defendants the jury viewed as constituting negligence. The court instructed the jury: "Negligence is the failure to use reasonable care to prevent harm to oneself or to others. [¶] A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. [¶] You must decide how a reasonably careful person would have acted in defendants'

45

situation."[13]  As noted, the court also instructed the jury that plaintiffs sought

"overpayment of rent" as both contract and tort economic damages and that the jury could

award damages for overpayment of rent under plaintiffs' negligence theory.

As we also noted above, plaintiffs' counsel argued to the jury that charging

unreasonably high rent constituted negligence, stating, "A person is negligent if he or she

does something that a reasonably careful person would not do in the same situation or

fails to do something that a reasonable, careful person would do in the same situation.  [¶]

Well, what's reasonable care?  You maintain your lots.  You maintain your property.

*When you set rents, you set a reasonable rent.*  Because, you know, if you don't, you're

going to cause harm.  That's what a reasonably prudent person does.  All these things

are . . . acts of negligence."  The jury instructions and counsel's argument plainly allowed

the jury to find defendants liable under plaintiffs' negligence theory based on a finding

that the high rental rates defendants charged the plaintiffs were unreasonable,

notwithstanding any legal authorization for charging those rates.

A lessor's charging rental rates that are authorized by contract or law cannot

constitute negligence.  In a contract for services, a contracting party may be liable for

negligence in the performance of those services or failure to perform.  (E.g., *Bily v.*

*Arthur Young & Co.* (1992) 3 Cal.4th 370, 419 ["Under the fundamental principle

governing the scope of negligence liability, accountants are liable for all reasonably

---

13    The court also gave negligence per se instructions based on California regulations concerning electrical wiring and equipment in mobilehome parks.  The negligence per se instructions arose from plaintiffs' nuisance theory that defendants failed to properly maintain the park, which the jury rejected.

foreseeable injuries caused by the negligent performance of their professional duties."];

*Eads v. Marks* (1952) 39 Cal.2d 807, 810-811.)  But outside that context, where a contract calls for the payment of money in exchange for use of property or other consideration not involving the provision of services, we are aware of no authority for the proposition that the contracting party receiving payment of money can be held liable on a negligence theory for charging a price that the contract expressly allows.  The jury's compensatory damage award based primarily on high rent is not sustainable as damages that the jury could properly have awarded under plaintiffs' negligence theory.

*Breach of Contract/Breach of the Covenant of Quiet Enjoyment*

The factual bases for plaintiffs' claims for breach of contract and breach of the covenant of quiet enjoyment are somewhat unclear, but high rent is one of them.  In the second cause of action for breach of contract in plaintiffs' first amended complaint, plaintiffs alleged that although the form of contract varied between defendants and each plaintiff, "the essential common provisions are that Plaintiffs agreed to pay rent in exchange for Defendants' promise to:  "(1) provide and maintain the Park's common areas, facilities, services and physical improvements in good working order and condition; (2) provide a lot in safe, habitable condition; (3) enforce Park rules regulations consistent with the requirements of Civil Code section 798.15; (4) deal with Plaintiffs in good faith; and, (5) *preserve Plaintiffs' quiet enjoyment of their premises.*"  (Italics

added.)  The second cause of action then alleges that defendants breached the contracts

"as set forth herein and in paragraphs 12 and 13."[14]

In their 10th cause of action for breach of the covenant of quiet enjoyment

plaintiffs alleged:  "Defendants have breached the covenant by failing to maintain the

Park as set forth herein in paragraphs 12 and 13, *by interfering with Plaintiffs' ability to*

*sell their mobilehomes in place[,] including by raising rents to unreasonably high levels*,

by illegally changing the use of the Park, and by Defendants' other actions and conduct

alleged in this Complaint."  (Italics added.)

The court instructed the jury along the line of plaintiffs' primary nuisance theory

that "[d]efendants have a contractual duty to provide and maintain the Park's physical

improvements in the common facilities in good working order and condition" and that

"[a] failure by defendants to provide and maintain the Park's physical improvements in

the common facilities in good working order and condition is a breach of contract."  The

court instructed the jury along the line of plaintiffs' secondary nuisance theory that

"[d]efendants, as a matter of law, have a duty to enforce the rules and regulations of the

Park" and that "[a] failure to enforce the rules and regulations is a breach of the contract's

covenant of quiet enjoyment."  As noted, the court also instructed the jury that it could

award "overpayment of rent" under plaintiffs' theories of breach of contract and breach of

the covenant of quiet enjoyment, among other theories.

---

14    Paragraph 12 is within plaintiffs' nuisance cause of action and includes over four
pages of allegations regarding defendants' poor maintenance of the park.  Paragraph 13
alleges plaintiffs' compliance with a statutory requirement to serve notice of their
intention to file this action on defendants.

48

In closing argument, plaintiffs' counsel advised the jury that "[a] failure to enforce the rules and regulations is a breach of contract and a breach of the covenant of quiet enjoyment. [¶] So these all run through the causes of action. And the causes of action do different things legally, but the facts that give rise to them and the breach of them are all the same. They're not enforcing the rules. They're not maintaining the park. They're not maintaining their own homes. *They're cheating the people in the rents, all common themes.*" (Italics added.)

The jury's finding that defendants breached their rental agreements with plaintiffs and breached the covenants of quiet enjoyment included in those agreements was likely based in part on its finding under plaintiffs' nuisance claim that defendants failed to enforce or follow the park's own rules and regulations, since the jury rejected the other theory for nuisance (and breach of contract) that defendants failed to maintain the park in good working order and condition. As with the nuisance theory, however, we cannot reasonably conclude the jury based its damage awards primarily on its finding that defendants failed to enforce park rules and regulations. Given the above-noted jury instructions and argument of counsel, it is more likely that the jury based its verdict and damage award under plaintiffs' "breach of contract/breach of the covenant of quiet enjoyment" theory primarily on the high rent defendants charged plaintiffs. It needs no citation to authority to state that a contracting party's performance of a contract in accordance with its express terms or the law cannot constitute a breach of the contract. Defendants cannot be held liable for breach of contract or the covenant of quiet enjoyment by charging rent expressly authorized by a written lease or allowed by law.

49

*Unsegregated Verdict Form*

Plaintiffs argue that because the special verdict form did not segregate the jury's award of damages by causes of action, defendants cannot establish prejudice from Special Instruction No. 66. Plaintiffs cite several cases for the proposition that the law prohibits speculation about the jury's apportionment of damages when an unsegregated verdict form is used (*Moore v. Preventative Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728 (*Moore*); *Heiner v. KMart Corp.* (2000) 84 Cal.App.4th 335 (*Heiner*); and *White v. Inbound Aviation* (1999) 69 Cal.App.4th 910 (*White*)), and suggest that defendants forfeited the right to assert error because they did not object to use of the verdict form, citing *Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150 (*Greer*). Plaintiffs' argument raises the question whether our inability to determine the jury's allocation of damages between the various legal theories presented on the special verdict requires affirmance of the entire unsegregated verdict.

*Greer* and the other cases plaintiffs cite are distinguishable from this case in that the unsegregated damages awards in those cases were legally viable and supported by the evidence. In the present case, the jury's unsegregated award of economic damages is not sustainable under any legal theory presented to the jury on the verdict form because, as we discussed, the awards were clearly and improperly based largely on high rental rates that the parties' rental agreements authorized.

The *Greer* court concluded the defendant in that case forfeited his claim that the trial court erred in failing to direct the jury to segregate damages for medical expenses from lost earnings because defendant failed to request a special verdict requiring a

50

separate entry for the plaintiff's past medical expenses. (*Greer, supra*, 141 Cal.App.4th at pp. 1157-1158.) The defendant wanted the award of medical expenses segregated and specified so that he could challenge a portion of that award. (*Id.* at p. 1158.) The *Greer* court stated the general rule that "[t]o preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages. [Citations.] The reason for this rule is simple. Without a special verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal." (*Ibid.*)

However, unlike the present case, the unsegregated total award in *Greer* did not include an award that could not be sustained on appeal. The *Greer* court noted that the unsegregated award of economic damages "was easily justified by the evidence." (*Greer, supra*, 141 Cal.App.4th at p. 1158.) The *Greer* court further noted that the verdict "did not suffer from any legal defect—it simply was not *specific enough* to render it amenable to the type of challenge defendant now raises." (*Id.* at p. 1159.) The court distinguished cases where defects in a verdict are not forfeited by failure to object to the verdict form because those cases "involved ambiguity or inconsistency *in the verdict itself*." (*Ibid.*, citing *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457; *All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1220; and *Tri-Delta Engineering, Inc. v. Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 756-757.)

In *Moore* the defendant did not challenge the verdict form at trial and, consequently, forfeited its complaint on appeal that the jury failed to segregate economic damages from noneconomic damages. (*Moore, supra*, 178 Cal.App.3d at p. 746.) The *Moore* court noted that defendant itself had requested the verdict form used and did not object to it even after the jury returned its verdict. (*Ibid.*) Unlike the present case, the unsegregated verdict in *Moore* did not obviously award damages that were legally unsustainable, as the court did "not believe retrial on the issue of damages [was] required." (*Id.* at p. 747.)

In *Heiner* the Court of Appeal concluded the defendant "waived" (i.e. forfeited)[15] its right to challenge the admission of plaintiff's expert's testimony about loss of future profits on appeal because defendant did not object to the testimony or request a special verdict form that segregated the elements of damages. (*Heiner, supra*, 84 Cal.App.4th at pp. 346, 348.) The court also decided the defendant was not significantly prejudiced by the testimony because the jury's award was substantially less than the expert's projected lost future profits. (*Ibid.*) Unlike the verdict in the present case, the verdict in *Heiner* did not reflect an award that was legally unsustainable or insufficiently supported by the evidence. In *White*, the Court of Appeal simply noted the waiver/forfeiture general rule but did not apply it because the verdict in that case could be segregated logically. (*White, supra*, 69 Cal.App.4th at pp. 930-931.)

---

15    While parties and case law often "refer to a 'waiver' of the issue on appeal, 'the correct legal term for the loss of a right based on failure to timely assert it is "forfeiture," because a person who fails to preserve a claim forfeits that claim.' " (*Greer, supra*, 141 Cal.App.4th at p. 1158, fn. 4, quoting *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.)

In the present case, neither the instructions nor verdict form directed the jury to segregate economic damages by category—i.e., to specify the type of damages it was awarding (e.g., diminution of value and overpayment of rent)—and the verdict form did not require the jury to segregate any compensatory damages by cause of action or legal theory. This rendered the verdict ambiguous because we cannot determine what portion of the jury's compensatory damage award is based on the condition of the park as a result of defendants' failure to follow park rules and what portion is based on high rent. However, as we discussed, it is clear from the record that any damages based on defendants' failure to follow park rules are substantially dwarfed by improper compensatory damages based on high rent. Because we are unable to resolve the ambiguity in the verdict form and cannot conclude the entire award of compensatory damages reasonably could have been based on a viable legal theory other than "overpayment" of rent, reversal is appropriate. (See *Demkowski v. Lee* (1991) 233 Cal.App.3d 1251, 1263 [reversal required where verdict form was ambiguous in failing to require segregation of damages to prevent a double recovery and reviewing court was unable to resolve the ambiguity and conclude there was no double recovery].)

In summary, the jury instructions, testimony of plaintiffs and Caringella, and argument of counsel allowed the jury to incorrectly conclude it could properly award, under multiple theories, the difference between what plaintiffs paid in rent and what they would have paid had their rent been in the fair market range that Caringella quoted, and that it could also hold defendants liable in tort and award punitive damages against them for charging plaintiffs such "overpayment of rent" and for the diminution in the value of

53

their homes the high rent caused.  As the California Supreme Court has noted in the context of a criminal trial, " 'Jurors are not generally equipped to determine whether a particular theory . . . submitted to them is contrary to law. . . .  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.' " (*People v. Guiton* (1993) 4 Cal.4th 1116, 1125, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59.)

II. *Unqualified Reversal Rule and Reversal of Punitive Damage and Attorney Fee Awards*

Our reversal of the compensatory damage awards sets the case at large for retrial of plaintiffs' claims and requires reversal of the punitive damage and attorney fees awards to plaintiffs.  As a general rule, " 'an unqualified reversal remands the cause for a new trial . . . and places the parties in the trial court in the same position as if the cause had never been tried, with the exception that the opinion of the court on appeal must be followed so far as applicable.' [Citation.]  This principle is equally applicable to a partial reversal of the judgment." (*Hall v. Superior Court* (1955) 45 Cal.2d 377, 381; *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 758 ["The effect of our reversal of the judgment in part is to place the parties in the position they were in before the case was tried with respect to those issues on which we reverse the judgment."].)

Where there will be a new trial on the issue of compensatory damages, "[e]xemplary damages must be redetermined as well, as 'it would be improper and

premature to assess such damages until or concurrently with the assessment of "the actual damages" ' [citation] and 'exemplary damages must bear a reasonable relation to actual damages' [citation] even though no fixed ratio exists to determine the proper proportion [citation]." (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284.)

Our reversal of the judgment also necessarily compels the reversal of the award of attorney fees and costs to plaintiffs based on the judgment because " '[a]fter reversal of a judgment "the matter of trial costs [is] set at large." ' " (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053.) "The costs to which a prevailing party are entitled include attorney's fees authorized by statute. (Code Civ. Proc., § 1033.5.) An order awarding costs falls with a reversal of the judgment on which it is based. [Citation.] Thus, the [order] and judgment awarding attorney's fees and costs must also be reversed." (*Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402; accord, *Giles v. Horn* (2002) 100 Cal.App.4th 206, 241; *Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1105.)[16]

### III. *Unconscionability and Plaintiffs' UCL Claim*

Our conclusion that plaintiffs' compensatory damages cannot properly be based on high rent that is authorized under the parties' rental agreements raises the question of what, if any, remedy exists for a mobilehome park tenant who is trapped in a lease or month-to-month rental agreement that has resulted in high monthly space rent that renders the tenant's mobilehome unsalable. One appellate court has observed that "[a]

---

[16]    Plaintiffs' request for judicial notice of the reporter's transcript of the June 9, 2017 hearing on plaintiffs' motion for attorney fees is denied as moot.

party to a commercial lease who is trapped in a bad bargain has only one escape route left:  to invoke the doctrines of adhesion and unconscionability."  We believe the same is true for a party to a mobilehome park lease who is trapped in a bad bargain.  (*Ilkhchooyi v. Best* (1995) 37 Cal.App.4th 395, 409 (*Ilkhchooyi*).)  As we explain below, the trial court's ruling that the subject leases are not unconscionable and its adjudication of plaintiffs' cause of action for violation of the UCL are not severable from the portion of the judgment we are reversing.  Consequently, we will vacate the order addressing unconscionability and the portion of the judgment adjudicating the UCL claim.

*General Unconscionability Principles*

The Legislature codified the doctrine that a court may refuse to enforce an unconscionable contract provision as follows:  "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  (Civ. Code, § 1670.5, subd. (a); *Ilkhchooyi, supra*, 37 Cal.App.4th at p. 409.)

The term "unconscionability" " ' "has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  [Citation.]'  [Citation.] . . . [U]nconscionability [has] procedural and substantive elements, both of which must be present to invalidate a clause.  The procedural element includes (1) oppression 'aris[ing] from an inequality of bargaining power which results in no real negotiation and "an

56

absence of meaningful choice" [citation]'; and (2) surprise 'involv[ing] the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. [Citation.]' [Citation.] The substantive element includes terms that are one-sided, lacking in justification, and 'reallocate[ ] the risks of the bargain in an objectively unreasonable or unexpected manner.' " (*Ilkhchooyi, supra*, 37 Cal.App.4th at pp. 409-410.) "[T]here is a 'sliding scale relationship between the two concepts [of procedural and substantive unconscionability]: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause.' " (*Id.* at p. 410.)

Although cases have observed that Civil Code section 1670.5 does not create an affirmative cause of action (e.g., *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 762), we conclude that unconscionability can be properly claimed affirmatively through a cause of action for declaratory relief under Code of Civil

Procedure section 1060.[17]  In *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634

(*Meyer*), the Court of Appeal noted that declaratory relief under section 1060 "has

frequently been used as a means of settling controversies between parties to a contract

regarding the nature of their contractual rights and obligations" and that "there [was] no

doubt a present controversy exist[ed] regarding whether certain terms of a contract to

which plaintiffs and defendant [were] parties [were] unconscionable and unenforceable."

(*Id.* at pp. 647-648.)

Although the lawsuit in *Meyer* was partly brought under the Consumer Legal

Remedies Act, which authorizes an affirmative action by a consumer who suffers any

damages as a result of an unconscionable provision in a contract involving the sale of

goods or services (Civ. Code, §§ 1770, subd. (a)(19), 1780, subd. (a)), nothing in the

*Meyer* court's discussion of the cause of action for declaratory relief brought by the

plaintiff in that action indicates that a plaintiff may not seek adjudication that a contract

provision is unconscionable through a cause of action for declaratory relief in an action

---

17    Code of Civil Procedure section 1060 provides:  "Any person interested under a
written instrument, excluding a will or a trust, or under a contract, or who desires a
declaration of his or her rights or duties with respect to another, or in respect to, in, over
or upon property, or with respect to the location of the natural channel of a watercourse,
may, in cases of actual controversy relating to the legal rights and duties of the respective
parties, bring an original action or cross-complaint in the superior court for a declaration
of his or her rights and duties in the premises, including a determination of any question
of construction or validity arising under the instrument or contract.  He or she may ask
for a declaration of rights or duties, either alone or with other relief; and the court may
make a binding declaration of these rights or duties, whether or not further relief is or
could be claimed at the time.  The declaration may be either affirmative or negative in
form and effect, and the declaration shall have the force of a final judgment.  The
declaration may be had before there has been any breach of the obligation in respect to
which said declaration is sought."

58

that is not brought under the CLRA,[18] and there is nothing in the language of Code of Civil Procedure section 1060 that precludes a party to a contract from seeking a declaration that the contract is unenforceable because it is unconscionable.  (See *Vance, supra*, 36 Cal.App.4th at pp. 701-702, 709 [Mobilehome owners brought an action for declaratory relief seeking a judicial declaration that the rents charged pursuant to the leases were unconscionable and declaring what rents could be charged in the future.]; *Willard v. AT&T Communications of California, Inc.* (2012) 204 Cal.App.4th 53, 56 [plaintiffs brought a cause of action for declaratory relief seeking to deem telephone service contract unconscionable]; *Ilkhchooyi, supra*, 37 Cal.App.4th at pp. 403, 407-411 [judgment on a cause of action for declaratory relief and other causes of action correctly found a lease provision was unconscionable].)

Although unconscionability is a question of law that we review de novo (*Ilkhchooyi, supra*, 37 Cal.App.4th at p. 411), "[a] determination of unconscionability requires the development of a factual record to inform such analysis."  (*Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1293, fn. 7.)  The present case is a prime example of that principle.

---

18    The *Meyer* court simply decided that the trial court did not abuse its discretion in sustaining a demurrer to a cause of action for declaratory relief regarding the unconscionability of future remedies allowed by a contract because no dispute had arisen yet that would cause the remedy provisions to come into play and "courts have considerable discretion, pursuant to Code of Civil Procedure section 1061, to deny declaratory relief because it 'is not necessary or proper at the time under all the circumstances.' "  (*Meyer, supra*, 45 Cal.4th at p. 648.)

As noted above, at the beginning of trial before hearing any evidence the court ruled that defendants rent increase provisions were not procedurally unconscionable, and that the subject leases were not adhesion contracts. However, after hearing the evidence and discharging the jury, the court reversed that ruling, stating, "Now, after hearing all the evidence presented at trial, the court finds the catch-up provision is unconscionable." The court then became concerned that its reversal of its ruling on unconscionability was prejudicial to defendants, so it decided to vacate its order finding unconscionability based on the evidence and reinstate its original ruling finding no unconscionability. Instead of finding the catch-up provision was unconscionable, the court ultimately ruled it violated the UCL because it was unfair and unreasonable. However, notwithstanding its ultimate ruling on the issue of unconscionability, it is clear that "development of a factual record to inform [the court's unconscionability] analysis" caused the court to at least temporarily conclude that the catch-up provision was unconscionable.

In light of our reversal of the portion of the judgment awarding compensatory and punitive damages, we will also reverse and set at large for retrial the portion of the judgment reflecting the court's adjudication of plaintiffs' cause of action under the UCL. "In deciding whether to permit retrial only on certain issues, we must determine whether those trial court determinations which were affected with error may be fairly and conveniently severed from those which were not." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 552, overruled on another point by *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) A portion of a judgment is not severable and subject to independent examination and affirmance on appeal when the matters or issues it embraces are the

60

same as or interdependent on the matters or issues embraced by a portion to be reversed on appeal. (*Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 351, fn. 12, citing *Gonzales v. R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 805-806.) Further, when an appellate court partially reverses a judgment as to certain severable issues and sets those issues at large to be retried, it is an abuse of discretion to not allow retrial on a related issue where a limited retrial might be prejudicial to either party on that issue. (*Curties v. Hill Top Developers, Inc.* (1993) 14 Cal.App.4th 1651, 1656-1657.) "Whether an issue can be tried separately without prejudice to any party depends on the particular circumstances of each case." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 696.) Any doubts as to whether the limited new trial is appropriate should be resolved in favor of a retrial on the related issue. (*Ibid.*)

We conclude the portion of the judgment reflecting the court's adjudication of plaintiffs' cause of action under the UCL is not severable from the portions of the judgment awarding damages. The plaintiffs' UCL claim embraces the same rent-overpayment issues that are the gravamen of their claims for compensatory and punitive damages and the probable main basis of the jury's compensatory and punitive damage awards. The fact that the court reversed its finding of no unconscionability and found the catch-up provision in defendants' lease was unconscionable *after considering the evidence presented at trial*, and then later changed that unconscionability finding to a finding of unfairness under the UCL to avoid inconsistent unconscionability rulings underscores that plaintiffs' UCL clam is based on the same evidence and, therefore, is interdependent on and inextricably intertwined with their damages claims. Defendants

61

were prejudiced by the changes in the court's ruling on the catch-up provision in that if the court had not ruled at the beginning of trial that the catch-up provision was lawful and not unconscionable, defendants may have presented evidence to defend their use of that provision. In light of the fact that the entire basis of the court's ruling in plaintiffs' favor on their UCL claim was the court's finding that the catch-up provision was unfair, we conclude it could be prejudicial to defendants to not allow a retrial of that claim along with plaintiffs' claims for damages. Accordingly, we reverse the portion of the judgment adjudicating plaintiffs' UCL claim and vacate the court's order finding the catch-up provision is not unconscionable to give the court on remand a clean slate to consider the UCL claim, as well as the unconscionability claim included in plaintiffs' 12th cause of action seeking declaratory and injunctive relief.[19]

IV. *Severable Portions of the Judgment Not Challenged on Appeal and Moot Contentions*

We will affirm the following portions of the judgment that are severable from the portions of the judgment we are reversing and are not challenged on appeal: the ruling that "the lease provisions concerning the right of first refusal, release, and the arbitration

---

[19]     Plaintiffs affirmatively raised the issue of whether the rent increases in their rental agreements were unconscionable in their 12th cause of action for rescission and declaratory and injunctive relief. Plaintiffs alleged "the rental terms within their leases and rental agreements and notices of rent increases . . . are unconscionable," and that certain rent terms in the parties' rental agreements "over a period of time became unconscionably high . . . ." They alleged an actual controversy between them and defendants exists in that they contend, and defendants deny, that they "have a right to continued tenancies in the Park at a rent level that corresponds to the reasonable worth of their tenancies[,]" and they sought a "declaration of [their] rights and obligations respecting [their] continued tenancies, leases and rental agreements in the Park and rent levels, and sale and use of their mobilehomes and a declaration of Defendants' duties[.]"

provision violate the [MRL]"; and the ruling that "paragraphs 56.1, 56.2 and 34 of the lease and paragraphs 5.1 and 9.1 of the lease amendment are unlawful."

Defendants appeal is in part a challenge to the court's order denying their motion for a new trial. Although an order denying a motion for a new trial is not appealable (Code Civ. Proc., § 904.1, subd. (a)(4)), it can be reviewed on appeal from the judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18-19.) However, in light of our reversal of the portions of the judgment that defendants challenge on appeal, the question whether the trial court abused its discretion in denying defendants' motion for new trial is moot and we need not address it further. In light of our disposition of the appeal, we also need not address defendants' contentions on appeal that: (1) the court abused its discretion in denying defendants' request to bifurcate the trial of plaintiffs' cause of action for violation of the UCL; (2) the court erred in ruling the catch-up provision was unfair under the UCL; (3) the court erred in ruling that defendants violated the UCL under the fraud prong of the UCL; (4) the court erred in denying Terrace View's motion for new trial on the ground of irregularity of the proceedings based on plaintiffs' counsel's improper opening and closing argument; and (5) the award of punitive damages was not sufficiently supported by evidence of malice, oppression, or fraud. In addition, defendants' appeal from the attorney fee award and plaintiffs' appeal from the order reducing the jury's award of punitive damages are moot.

## V. *Viable Claims on Remand*

As noted, our partial reversal of the judgment remands the cause for a new trial and places the parties in the same position as if the cause had never been tried, with the

63

exception that this opinion must be followed to the extent it is applicable. (*Hall v. Superior Court, supra*, 45 Cal.2d at p. 381.) Based on our discussion above, the following claims remain viable on remand: (1) plaintiffs' cause of action for declaratory relief, seeking a determination that certain provisions in plaintiffs' long-term leases are unconscionable; (2) plaintiffs' cause of action for unfair business practices in violation of the UCL; (3) plaintiffs' nuisance claims that defendants failed to maintain the park in good working order and condition and failed to follow their own park rules that required them to maintain park-owned vacant mobilehomes in good condition; and (4) plaintiffs' claims for breach of contract and breach of the covenant of quiet enjoyment, to the extent these claims are based on conditions in the park and not on high rent. Plaintiffs' cause of action for intentional interference with property rights may be legally viable; however, as we discussed, it cannot properly be based on rental rates allowed by the parties' leases or law.

## DISPOSITION

The portions of the judgment awarding plaintiffs compensatory and punitive damages are reversed. The portion of the judgment ruling that the catch-up provision in defendants' leases violates Business and Professions Code section 17200 and ordering injunctive relief regarding the catch-up provision is reversed. The June 9, 2017 and July 24, 2017 orders awarding attorney fees and costs to plaintiffs and the portion of the judgment reflecting the June 9 order are reversed. The portions of the judgment ruling that "the lease provisions concerning the right of first refusal, release, and the arbitration provision violate the [MRL]" and that "paragraphs 56.1, 56.2 and 34 of the lease and

64

paragraphs 5.1 and 9.1 of the lease amendment are unlawful" are affirmed. The

February 21, 2017 order awarding punitive damages to plaintiffs is reversed. Defendants'

appeal from the June 9, 2017 order awarding attorney fees and costs and the July 24,

2017 order correcting the award of attorney fees, and plaintiffs' appeal from the February

12, 2017 order reducing the jury's award of punitive damages are dismissed as moot.

Defendants are awarded their costs on appeal.


                                                            McCONNELL, P. J.

WE CONCUR:



HALLER, J.



GUERRERO, J.

Filed 3/21/19

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID BEVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TERRACE VIEW PARTNERS, LP, et al., <br><br> Defendants and Appellants. | D071849 <br><br><br> (Super. Ct. No. 37-2013-00057526-CU-PO-EC) <br><br><br> ORDER DENYING PETITION FOR REHEARING, MODIFYING OPINION, AND CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| DAVID BEVIS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> TERRACE VIEW PARTNERS, LP, et al., <br><br> Defendants and Appellants. | D072825 <br><br><br> (Super. Ct. No. 37-2013-00057526-CU-PO-EC) |

THE COURT:

The court treats plaintiffs' motion filed on March 15, 2019 for clarification of the court's decision as a petition for rehearing. The petition is DENIED.

It is ordered that the opinion filed herein on February 28, 2019 be modified as follows:

On page 64, the words "negligence and negligence per se," are to be inserted in subpart (4) of the second full sentence of section V. between "quiet enjoyment," and "to the extent, so that subpart (4) of the sentence reads: "(4) plaintiffs' claims for breach of contract and breach of the covenant of quiet enjoyment, negligence, and negligence per se, to the extent these claims are based on conditions in the park and not on high rent. There is no change in the judgment.

The opinion in this case filed February 28, 2019, was not certified for publication. It appearing the opinion meets the standard for publication certified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED as follows:

IT IS HEREBY CERTIFIED that the opinion, except for the section in the opinion's Factual and Procedural Background under the heading *The Court's Ruling on Plaintiffs' UCL Claim* beginning on page 23 and ending on page 26, and sections III and IV of the Discussion, meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and replaced with the words "Certified for Partial Publication" followed by a footnote designated with an asterisk, which shall read: "Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for

2

publication except for the section in the opinion's Factual and Procedural Background under the heading *The Court's Ruling on Plaintiffs' UCL Claim* beginning on page 23 and ending on page 26, and sections III and IV of the Discussion." It is further ordered the opinion herein be published in the Official Reports in conformity with this order.


MCCONNELL, P. J.


Copies to:  All parties


3